# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

**VINCENT J. NAIMOLI,**

    **Appellant,**

v.                                          **Case No. 8:05-cv-2304-T-30TBM**

**ANCHOR GLASS CONTAINER CORPORATION, et al.,**

    **Appellees.**

_____

## **ORDER**

Appellant (or "Naimoli") appeals from the Bankruptcy Court's Order dismissing his Second Amended Complaint after concluding that Anchor Glass Container Corporation (hereafter "Anchor") was not a proper party to the lawsuit and that the suit against the individual non-debtor Defendants was unrelated to the bankruptcy estate. After having reviewed the briefs of the parties and hearing oral argument on July 5, 2006, this Court determines that Anchor is a proper party in the lawsuit and that the claim against the individual non-debtor Defendants is sufficiently related to provide supplemental jurisdiction.[1]

---

[1] The parties dispute whether supplemental jurisdiction rules apply to bankruptcy proceedings. That issue is moot since this Court will be withdrawing the reference and the bankruptcy case will be proceeding here. It is also moot because the individual defendants were separately sued in this Court and the bankruptcy case will be consolidated with that pending case.

This Court will therefore reverse and remand for further proceedings consistent with this Order.[2]

## FACTUAL BACKGROUND

In ruling upon a motion to dismiss, the Court is required to accept the facts alleged in the Complaint as true. Therefore, the Court accepts the following description of the factual background as asserted[3] by Appellant:

> Mr. Naimoli is a participant, as defined in the Employment Retirement Income and Security Act ("ERISA"), Title 29, United States Code, Section 1002(7), in the Anchor Glass Container Corporation Service Retirement Plan (the "Anchor Plan") that Anchor Glass Container Corporation ("Anchor") sponsored, and in the Anchor Plan's predecessor plan, the Anchor Glass Container Corporation Retirement Plan for Salaried Employees (the "Salaried Plan") (hereinafter collectively referred to as the "Plans"). (Dkt. No. 7-2 at p. 23, ¶4). The Plans are "employee pension benefit plans" within the meaning of Section 1002(2)(A).[4] (Id.)
>
> Mr. Naimoli, Anchor's Chairman and CEO, terminated his employment with Anchor in 1989. (Dkt. No. 7-2 at p. 3, ¶5). He reached retirement age under the Plans on September 20, 2002, at which time his pension benefit should have been at least $6,487.78 per month. (Id.) Upon the Pension Benefit Guaranty Corporation's ("PBGC"), takeover of the Anchor Plan, Mr. Naimoli's benefit was reduced to $3,514.40 per month. (Id.).
>
> Anchor originally adopted the Salaried Plan on May 7, 1983 to provide retirement benefits to Anchor's salaried employees. (Dkt. No. 7-2 at p. 6, ¶10). The Salaried Plan was a defined benefit plan, as defined under ERISA,

---

[2] Appellant has also filed a motion to withdraw the reference of this bankruptcy proceeding. That motion will be granted so that future proceedings on this claim will take place in this Court.

[3] Of course, these facts may or may not be supported by facts in the record after completion of discovery.

[4] Copies of pertinent provisions of the Anchor Plan and the Salaried Plan are attached to the Second amended Complaint as Exhibits A-1 and A-2. (Dkt. No. 7-2).

meaning that Anchor bore the responsibility for adequately funding the plan to pay for future benefits upon retirement. (Id.) At all relevant times, the Salaried Plan was fully funded and, indeed, was overfunded. (Id.) Thus, the funds held in the plan's trust were more than adequate to meet the future pension liabilities to fund the salaried workers' retirement benefits. (Id.)

In November 1989, Vitro S.A. ("Vitro") acquired substantially all the assets of the original Anchor corporation. (Dkt. No. 7-2 at p. 7, ¶11). At that time, Mr. Naimoli stepped down as President and Chairman of the old Anchor corporation and terminated his employment with Anchor. (Id.) After Vitro's acquisition, the old Anchor did not prosper. (Id.) On September 13, 1996, the Anchor Resolution Corporation filed a Voluntary Petition for Relief under chapter 11 of the United States Bankruptcy Code for the District of Delaware. (Dkt. No. 7-2 at p. 8, ¶18).

During this period, Anchor maintained two defined benefit plans for Anchor's hourly workers, in addition to the Salaried Plan. (Dkt. No. 7-2 at p. 7, ¶13). In contrast to the fully-funded Salaried Plan, the hourly workers' plans were dangerously underfunded.[5] (Id.). On January 9, 1997, the PBGC announced its intention to institute involuntary termination proceedings due to the underfunding of the hourly workers' plans. (Dkt. No. 7-2 at p. 7, ¶14). After receiving a guarantee from Vitro, the PBGC agreed not to implement the termination proceedings. (Id.).

On February 5, 1997, a group of purchasers bought substantially all of the old Anchor's assets and formed the entity currently referred to as "Anchor" in this Complaint. (Dkt. No. 7-2 at p. 7, ¶15). Appellee Ghaznavi was the Chairman, CEO, and a Director of the new Anchor. (Id.). The new Anchor was liable for ensuring that all three pension plans were funded adequately. (Dkt. No. 7-2 at p. 8, ¶16).

Effective December 31, 1998, Anchor merged the Salaried Plan with the hourly workers' plans to form the Anchor Plan (the "Plan Merger"). (Dkt. No. 7-2 at p. 8, ¶18). This merger allowed Anchor to meet its funding

---

[5] In its 1997 SEC filings, Anchor stated that the hourly workers' plans "are significantly underfunded and will require substantial cash contributions over the next few years." (Dkt. No. 7-2 at p. 8, ¶16). In 1997 alone, Anchor's underfunding obligations were approximately $15.1 million. In addition, this underfunding required the payment of increased premiums to the PBGC in the amount of approximately $1.8 million. (Dkt. No. 7-2 at p. 7, ¶13).

obligations for the hourly plan by using the money that had formerly been held in trust for the salaried workers' retirement benefits. (Id.)

When Appellees decided to merge the Plans, they did not use the PBGC rates in calculating the termination basis of benefits. (Dkt. No. 7-2 at p. 9, ¶21). Instead, the Appellees used discount rates that unreasonably made the plans appear more fully funded than they actually were. (Id.) The new Anchor Plan never was funded adequately either at the time of the Plan Merger or thereafter. (Dkt. No. 7-2 at p. 9, ¶22). Anchor used the Plan Merger process to reduce Anchor's crippling pension obligations and to increase Anchor's bottom line, all at the expense of Mr. Naimoli and the Plan participants. (Dkt. No. 7-2 at p. 9, ¶23).

Appellees, in their capacity as fiduciaries,[6] exercised discretionary authority and control respecting management of the Salaried Plan; exercised authority and control respecting management of or disposition of the Salaried Plan's assets; and had discretionary authority or discretionary responsibility in their fiduciary duties. (Dkt. No. 7-2 at p. 11, ¶¶ 29-31).

On or about July 31, 2002, the Anchor Plan finally was terminated due to severe underfunding. (Dkt. No. 7-2 at p. 10, ¶ 25). On or about September 3, 2002, the PBGC announced that it had assumed responsibility for the Plan. (Dkt. No. 7-2 at p. 10, ¶26). The PBGC estimated that the Plan had approximately $336 million in assets to cover approximately $555 million in benefit liabilities. (Id.)

In August 2003, Mr. Naimoli learned that he would not receive the full amount that he was promised he would receive in his first pension check. (Dkt. No. 7-2 at p. 10, ¶28). Mr. Naimoli did not know, and had no reason or opportunity to know, that he would not be receiving his full pension from Anchor until about August 2003. (Dkt. No. 7-2 at p. 27, ¶ 27). Prior to this date, Mr. Naimoli had frequent conversations with the responsible individual at Anchor who confirmed that Mr. Naimoli would be receiving his full retirement benefits. (Dkt. No. 7-2 at p. 10, ¶27). When he did discover that he was not receiving his full benefits, Mr. Naimoli hired Rebecca Harrison Steele, Esquire, who made numerous requests for documents from the Debtor and FOIA requests from various governmental agencies. (Dkt. No. 7-2 at p. 10, ¶ 28). It was not until late December 2003 that Mr. Naimoli received

---

[6] Appellees do not dispute that they are fiduciaries of the Plans with discretionary authority over Plan assets.

information that allowed him to realize that he has claims in connection with these pension benefits. (Dkt. No. 7-2 at p. 11, ¶29). Mr. Naimoli promptly filed the underlying lawsuit in December 2003.

On December 6, 2002, Mr. Naimoli requested from Anchor, the plan administrator, in writing, copies of the following documents: (a) a complete plan document for the Salaried Plan; (b) the Summary Plan Description for the Salaried Plan; (c) annual reports for the Salaried Plan from 1996 to December 6, 2002; (d) Forms 5500 from 1996 to 2002; (e) actuarial reports prepared for the Salaried Plan from 1996 to December 6, 2002; (f) all documents pertaining to the Salaried Plan filed with the Department of Labor; and (g) all documents pertaining to the Salaried Plan filed with or sent to the PBGC from 1996 to December 6, 2002. (Dkt. No. 7-2 at p. 11, ¶32). On April 15, 2003, the Anchor Plan Administrator partially responded to Mr. Naimoli's request. (Dkt. No. 7-2 at pp. 11-12, ¶33). However, the following documents were not provided: (a) a complete plan document for the Salaried Plan (a partial summary plan description was all that was provided); (b) any documents filed with the Department of labor, other than Forms 5500 for the years 1996-2000; (c) actuarial reports prepared in connection with the merger of the Plans (the only actuarial reports provided for the Salaried Plan were for the years ending 1996, 1997, and 1998); or (d) any documents filed with or sent to the PBGC. (Dkt. No. 7-2 at pp. 11-12, ¶33).

On September 24, 2003, Mr. Naimoli again wrote to request documents, including the following: (a) a complete plan document for the Salaried Plan; (b) a full summary plan description for the Salaried Plan (the document provided earlier was missing every other page); (c) any and all documents relating to the funding status of the Plans at the time of the merger, including actuarial certification documents; and (d) any and all documents relating to the funding status of the Anchor Plan at the time of its merger with the Glenshaw Glass Company, Inc. Service Retirement Plan, including actuarial certification documents. (Dkt. No. 7-2 at p. 12, ¶34). On October 23, 2003, again only some documents were provided, but the following were not: (a) a complete plan document for the Salaried Plan; (b) any documents relating to the funding status of the Plans at the time of the merger; or (c) any documents relating to the funding status of the Anchor Plan at the time of the merger with the Glenshaw plan. (Dkt. No. 7-2 at p. 12, ¶35). All of the documents that Mr. Naimoli requested were required to be provided under ERISA, but Appellees failed to produce these documents.

## **DISCUSSION**

It is Appellant's contention that, prior to the merger, the plan fiduciaries had over-funded the salaried plan and underfunded two other plans for hourly workers. Appellant further alleges that, rather than make the necessary contributions to appropriately fund the hourly workers' plans, the fiduciaries, to the detriment of the participants of the salaried plan, merged all of the plans into the new Anchor plan. Immediately following the merger, all participants were underfunded although the participants under the hourly workers' plans were better funded than before. Appellant further alleges that, after the merger, the fiduciaries continued to underfund the merged plan. That is, in his Complaint, Plaintiff alleges that Defendants breached their fiduciary duty to the participants of the salaried plan by (1) permitting a merger which reduced their funded benefits and (2) by underfunding the merged plan each year thereafter.

Appellees argue that Anchor Glass was not a proper party to the Bankruptcy Court action because once the plans were merged and then terminated by the PBGC, neither Anchor Glass nor any of the other Appellees had any authority or power to affect Appellant's retirement benefits because the PBGC now controls Appellant's retirement benefits. Appellees contend that the PBGC is required by law to allocate the plan assets in such a way that the former salaried plan participants are not harmed by the prior merger citing Trea. Reg. §1.414(l)-1(e)(2). Appellees' contention is that, since only the PBGC "has the ability to create the special schedule" to protect the salaried plan participants, "Appellant's claims should therefore be brought against the PBGC, not the Appellees."

Basically, Appellees are arguing that the Salaried Plan participants have an available remedy to avoid any losses that might be occasioned by the underfunded status created by the merger. Assuming arguendo that such remedy exists, that would be a matter of an affirmative defense, to wit: a failure to mitigate or avoid damages. It would not eliminate an existing breach of fiduciary duty claim for the alleged illegal merger, nor have any effect on the alleged breeches that came after the merger.

Appellees seek to buttress their argument by citing <u>Paulsen v. CNF, Inc.</u>, 2003 W.L. 22971080 (N.D. Cal., Nov. 24, 2003), judgment vacated by <u>Paulsen v. CNF, Inc.</u>, 2004 W.L. 2609227 (N.D. Cal., Mar. 3, 2004). In <u>Paulsen</u>, the court opined that when Congress vested PBGC with the power "to commence, prosecute, or defend on behalf of the plan any suit or proceeding involving the plan," it meant to take away the right of the individual participants to bring their own action for breach of fiduciary duty. This Court disagrees. Granting the PBGC "the power" to bring suit does not eliminate a participant's existing right to bring suit, a right specifically granted to plan participants by 29 U.S.C. §1132(a)(2). <u>See</u> 29 U.S.C. §§1058, 1104, 1109, and 1132.

This Court agrees with the reasoning of the United States District Court in <u>Harpster v. Aarque Management Corp.</u>, 2005 W.L. 1719120 (N.D. OH 2005), which states on page six of the opinion:

> In <u>Paulsen v. CNF, Inc.</u>, No. C 03-03960 JW, 2003 WL 22971080, *3-4 (N.D.Cal. Nov. 24, 2003), the court held that the Plan's trustee (PBGC) had the sole power to bring a lawsuit on behalf of the plan to recover plan assets, not the individual beneficiaries of a class of beneficiaries. The court reasoned that "[i]n order to avoid a select group of plan participants usurping a potential

> benefit owed to all Plan Participants that obtain non-guaranteed benefits, Congress has vested the sole power to initiate such lawsuits." *Id*. at *4. The court, therefore, dismissed the complaint because the plaintiffs lacked standing. *Id*.
>
> Such a conclusion, however, contravenes §1132(a)(2). Section 1132(a)(2) explicitly authorizes suits by individual plan participants against fiduciaries for a breach of fiduciary duty. Indeed, it authorizes suits against fiduciaries for a breach of their fiduciary duties by "a participant, beneficiary or fiduciary." Thus, the statute clearly contemplates that *either* plan participants or beneficiaries, like Plaintiffs here, *or* a plan fiduciary, like the PBGC, would bring a suit for a breach of fiduciary duty. Section 1342(d)(1)(B)(iv) does not state that the trustee has the sole power to bring suits, but merely "the power." Thus, the power to bring suits bestowed by §1342(d)(1)(B)(iv) does not preempt or preclude suits by individuals whom the statute elsewhere expressly gives the power to bring such suits.

This reasoning is also in accord with <u>Mertens v. Hewitt Assoc.</u>, 508 U.S. 248 (1993) and <u>Burnstein v. Retirement Acct. Plan for Employees of Allegheny Health Ed. & Research Foundation</u>, 334 F.3d 365 (3rd Cir. 2003).

Appellees' next argument is that the merger of two plans is a "plan design decision" and that such decisions do not come within the fiduciary responsibilities of the employer. While it is true that the decision to merge plans may be an administrative decision rather than a fiduciary one, that does not avoid a fiduciary's responsibility to exercise loyalty to plan participants and protect their benefits. For example, it is a breach of fiduciary responsibility to merge a plan with another plan unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger equal to or greater than the benefit he would have been entitled to receive immediately before the merger. 29 U.S.C. §1058 specifically provides in pertinent part:

> A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan after September 2nd, 1974, unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the plan had been terminated).

Here, Naimoli is alleging that Appellant's benefits were fully funded prior to the merger and became underfunded because of the merger. Further, the Complaint asserts that Appellees continued to underfund the plan after the merger which, if proven, would constitute additional breaches of fiduciary duty.

For the foregoing reasons, the Order of the Bankruptcy Court is REVERSED and this cause is REMANDED for proceedings consistent with this Order. The Clerk is directed to terminate any pending motions and CLOSE this file.

**DONE** and **ORDERED** in Tampa, Florida on July 7, 2006.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Bankruptcy Court Judge
Counsel/Parties of Record

F:\Docs\2005\05-cv-2304.bk order.frm